## THE MENOMINEE.

(District Court, E. D. New York. September 23, 1903.)

1. COLLISION—DAMAGES—TOTAL LOSS OF FISHING VESSEL—PROSPECTIVE CATCH.

In case of the total loss of a vessel by collision, damages are limited to the value of the vessel, with interest thereon and pending freight, or charter hire in the nature of freight; and the rule applies to a fishing vessel sunk while on a fishing voyage, and totally lost, except as to her outfit, and the value of her prospective catch during the remainder of the season or of the expedition cannot be allowed as an element of damages.

In Admiralty. Suit for collision. On exceptions to report of special commissioner as to damages.

Wing, Putnam & Burlingham (Harrington Putnam and Edward S. Dodge, of counsel), for libelants.

Convers & Kirlin (J. Parker Kirlin and Edward E. Blodgett, of counsel), for claimant.

THOMAS, District Judge. The steamship Menominee, by her own fault, collided off Nantucket with the fishing schooner Lucille, whereby the latter was lost, and practically everything on board, including 33 barrels of mackerel, and the effects of the master and crew. "Her two large seine boats were saved, the crew escaping in one, which was afterwards picked up by a fisherman after the Lucille's crew had boarded the Menominee, and the other being found later by the same fisherman, fast by her long painter to the sunken schooner. Each boat had one of the Lucille's seines in it at the time; and seines and boats, together with a few smaller articles picked up, were brought to Gloucester, and delivered to the owners, one of the boats being somewhat damaged."

The special commissioner found the following damage:

| | |
|---|---:|
| Value of Lucille | $ 5,500 00 |
| Outfit | 2,797 40 |
| Captain's effects | 236 65 |
| Probable catch | 1,500 00 |
| Use of seines and boats | 23 00 |
| Total | $10,057 05 |

Because of a stipulation between the parties that the claimant should pay 75 per cent. of the provable damages, the commissioner found that the libelant was entitled to recover the sum of $7,542.84, with interest from August 1, 1901, to June 1, 1903, amounting to $829.72. Inasmuch as the commissioner had allowed for loss of

¶ 1. See Collision, vol. 10, Cent. Dig. §§ 282, 287.

probable catch on the voyage interrupted by the collision, interest was allowed from the time of the probable termination of such voyage, and not from the date of the collision.

The report of the commissioner is approved, without further discussion, except as to the probable catch, and, if any amendment of the libel is necessary on account of the assessment of the value of the Lucille at $5,500, it may be made.

The allowance of the sum of $1,500 for probable catch, which includes the value of the 33 barrels of fish on hand at the time of the collision, should be considered. If such item as a whole should not be allowed, the 33 barrels of fish, at the market price ascertained by the commissioner, should be included in the decree. The commissioner finds that the Lucille "left Gloucester July 1st, fully manned and equipped for a mackerel seining voyage, provisioned for about six weeks, though the ordinary length of such a trip is about a month. She had already struck fish, and had taken and salted down 33 barrels of them, which were on board at the time of the accident." The collision happened on July 7th. The libelant claimed the loss of probable catch for the entire season; that is, for the July voyage, and also for a prospective voyage in August and September, and probably October. The commissioner allowed only for the loss of probable catch on the July voyage.

In The Umbria, 166 U. S. 404, 421, 17 Sup. Ct. 610, 41 L. Ed. 1053, it is stated that, as a general rule, "in cases of total loss by collision, damages are limited to the value of the vessel, with interest thereon, and the net freight pending at the time of the collision. The probable net profits of a charter may be considered in cases of delay occasioned by a partial loss, where the question is as to the value of the use of the vessel pending her repairs. In such cases the net profits of a charter, which she would have performed except for the delay, may be treated as a basis for estimating the value of her use." Had this been other than a fishing vessel, earnings that she might have made, but not assured by definite contract, would not have been allowed; and the question is whether, in the case of a fishing vessel, totally lost except as to her outfit, net profits, nonexistent but apprehended, shall be allowed by reason of the fact that it may be inferred from her own catch up to the time of her loss, and from the average catch of other vessels in the same vicinity, that she would have had similar good fortune, had not the injury occurred. Where a vessel is under charter, or has made such engagements as insure her freight, the owner of the vessel is deprived of vested existing property if the ship be precluded by the fault of another from continuing her voyage. The enjoyment of such property may be prevented by the possible contingency that the vessel may be unable, by reason of injurious vicissitudes, to perform her stipulations, or by the failure of the party who has assured the freight. But there would be a presumption that such vicissitudes or failure would not arise. If a vessel were going from port to port seeking freight which was not assured her by contract, it would not be concluded that she would be entitled to recover prospective freight, basing the conclusion upon the inference that it would have been

earned because at the time of the collision she had earned some freight, or upon former similar voyages she had made such earnings, or because other vessels at the same time, and pursuing the same traffic, had made such earnings; although in some instances the history of such vessel and of similar vessels may be used for the purpose of ascertaining the value of the loss of use of an injured vessel, where demurrage damages are permissible. The present question is not, what would be the juster rule of damages? but, what is the existing law? By what reasoning, or by what allowable solicitude for fishing smacks, should there be an application of one rule for fishing vessels and another for ambulatory vessels seeking freight at different ports to which they might come?

In The Hope (D. C.) 5 Fed. 822, and The Freddie L. Porter, Id., affirmed in 8 Fed. 170, the District Court held that in the case of a vessel chartered for a fixed term of time, totally lost by collision while in the performance of her employment, and before the contract had expired, the owners were entitled to recover as damages the net profits which they would have realized under the agreement for the whole period if the vessel had not been lost. This decision followed the principles laid down in The Canada, Lushington, 584, that there should be allowed "the gross freight, less the charges which would have been necessarily incurred in carrying such freight, and which were saved to the owners by the accident." There was a similar decision in The Rebecca, 1 D. & H. 356, by Judge Betts. In each case there was a total loss of the vessel. So, in the case of The Heroine, 1 Ben. 226, Fed. Cas. No. 6,416, where the vessel was injured by collision, Judge Blatchford considered that "the freight which the injured vessel was in the act of earning and has lost is allowed as a just measure of compensation," but that there must be deducted from the freight the vessel was engaged in earning the expenses she would have incurred if the voyage had been successfully performed. These decisions accord with that in The Baltimore v. Rowland, 8 Wall. 377, 386, 19 L. Ed. 463.

In The Gleaner, 3 Asp. Mar. Cas. 582, it appeared that while the fishing smack the Maud and Florence was engaged in drift-net fishing in the North Sea the fishing smack Gleaner ran into and fouled her nets; that they became so entangled that, after attempting to haul them in for some hours, the crew of the Maud and Florence cut them adrift, saving only 10 nets out of 60. The Maud and Florence was then laid up for the winter, as the fishing season lasted but four weeks longer, and the owners were unable to procure in time nets to enable them to resume their fishing. In an action for damages, in addition to a recovery for the nets themselves, there was an allowance of £72 for loss of four weeks' fishing. In making this allowance it was said:

"It is to be borne in mind that a smack of this class is solely used for net fishing, and if its nets are destroyed, and cannot be renewed at once, the smack itself is necessarily laid up unemployed for a certain time at the very period of the year when it would otherwise be profitably employed. According, therefore, to the ordinary principle on which demurrage and compensation for nonemployment is allowed in respect of a vessel disabled by injury to her hull and gear, some compensation is clearly due to the plaintiffs

in this case under that head; and, this being so, I have considered that the ordinary rule of allowing so much per ton per day is not applicable to a vessel of this class, which is not constructed and is never employed for the conveyance of cargo or passengers, or in earning freight in the common sense of the term, and that the plaintiffs are entitled to recover the probable net amount they were prevented from earning by the customary use of their smack and its fishing gear."

The defendants did not object to the report.

In the case of The Mary Steele, 2 Lowell, 370, Fed. Cas. No. 9,226, decided in the United States District Court of Massachusetts, it appeared that the libel was filed by the owners and crew of the schooner Hattie N. Reed and by the owners of a seine used in connection with such schooner in the mackerel fishery against the schooner Mary Steele, wherein it was charged that the Steele damaged the seine, whereby it was rendered useless, so that the libelants were obliged to carry it to Boston to be repaired, whereby they lost their trip, and were detained one week, and suffered damage. It was held that in assessing the collision damages the probable profits of the trip should be allowed, as the seine could neither be repaired nor replaced in less time than a trip would require, and it was of so great value that to assess it as total loss would exceed the damage incurred by the loss of the trip. Judge Lowell stated:

"As to the mode of ascertaining the value of the time lost there seems to be no other that can be applied than the probable profits. The schooner had a much larger number of men than merchant vessels carry, and different outfits. There is no customary rate of hire or market price for such vessels, and cannot be, from the mode in which the business is conducted."

In The Columbia, 9 Ben. 254, Fed. Cas. No. 3,035 (E. D. of N. Y.), it appears that an excursion steamer, coming from Rockaway to New York, overtook off Coney Inland a schooner on her return from a catch of menhaden, and towing behind her two boats holding her seine. The steamer struck one of the boats and carried off the seine, whereby both were lost. Upon a reference to ascertain the damages evidence was taken to show the probable amount of menhaden the schooner would have caught in the three-days delay that was necessary to get another seine and boat, it being just at the height of the fishing season. The commissioner found damages for the net lost and for the boat lost and certain interest, and also "for the fish, being one-sixth of the three-days estimated catch, at $1.10 per M," which finding was affirmed by the District and Circuit Courts.

In The Risoluto, 5 Asp. Mar. Cas. 93, damages for collision on July 6, 1881, between a bark and fishing brig, were involved. The brig was on the Great Bank of Newfoundland, and by reason of the collision she had to put into St. Pierre Miquelon, for repairs, whence she did not get back to the fishing grounds until the 26th of August, 1881. In addition to the cost of repairs, the plaintiffs claimed as demurrage 30,000 francs, grounding such claim on the basis of the loss of fish which average catches of other vessels showed the brig would have taken from the 6th July, 1881, the date of the collision, to the 26th August, 1881, or 30,000 cod, at an average of 1 franc per cod. The registrar reported that the loss sustained by the plaintiffs

amounted to the sum stated for loss of fish during the period mentioned. From the report the defendants appealed to the court, and notice of objection was filed in the registry by the defendants, the chief ground as to the demurrage allowed being that the registrar had estimated the loss of fishing on wrong principles, and had received improper evidence. The report of the registrar was affirmed.

In Guibert & Sons v. The British Ship George Bell (D. C.) 3 Fed. 581 (United States District Court for the District of Maryland), the question here involved arose. The libel was filed by the owners of the French brig Briha against the British ship George Bell for a collision in consequence of which the fishing vessel was sunk with all property on board. The ship Bell was solely to blame, and the case was referred to a master to compute the damages. The libelants excepted to the master's report, among other things, because the master disallowed their claim for the probable "catch" which, with reasonable certainty, they would have taken if they had been permitted to fish for the remainder of the season. The master's report showed that there remained 30 days of the fishing season, in which with reasonable certainty those on the Briha might have taken 15,000 fish additional to the cargo then on board. It was held that the master properly rejected the claim. The learned judge said:

"It is clearly to be excluded, under the rule hereinbefore adverted to. The probable earnings of a vessel have sometimes been considered in cases of partial loss in collisions, when there was no other means of ascertaining the loss to the owner by the detention of his vessel while being repaired; but in cases of total loss interest from the date of destruction is given in lieu of the profit which might have been gained by the owner by the subsequent use of his vessel."

In The Columbus, 3 W. Robinson, 159, it was held that:

"Where a vessel is sunk in a collision, and compensation is awarded by the court of admiralty to the full value of the vessel, as for a total loss, the plaintiff will not be entitled to recover anything in the nature of a demurrage for loss of the employment of his vessel or his own earnings in consequence of the collision."

The action was brought by the owners of the fishing smack the Tryall for damages for a collision in consequence of which the Tryall was sunk. She was raised at the expense of the owner of the Columbia and carried into Rye Harbor. The full value of the vessel was allowed, but the claim for a sum which her owner stated he would have earned for wages as master of the smack, and for a sum which he claimed as the average profits of the same from the time of the collision, was rejected. Dr. Lushington said:

"I do not recollect a case, and no case has been suggested to me, where a vessel has been considered as a total loss, and, the full value of that vessel having been awarded by the registrar and merchants, any claim has been set up for compensation beyond the value of that vessel. When I first read the papers in this case, I looked with much care and attention to see whether any precedent could be found, whether any single instance had occurred in the numerous cases which have arisen, not only in my own time, but in that of my predecessors; but I have found none; and the learned counsel who has argued the case on behalf of Mr. Woodward [the libelant] does not appear to have been more successful in his researches."

The learned counsel for the claimant also cites the unreported case of The City of Rome, Ad. Div., 11th May, 1887, cited in Marsden on Collisions, p. 135. The text states:

"A fishing smack recovered, besides the value of her nets and gear, which she was obliged to cut adrift, the amount she might reasonably have ex-pected to earn during the rest of the season [citing the Gleaner, 3 Asp. Mar. Law Cas. 582; The Clarence, 3 W. Rob. 283, 286; The Risoluto, 8 P. D. 109]. But it was held by Sir J. Hannen in a recent case that, where the boat is totally lost, * * * the prospective catch of fish could not be recovered, and the damages were confined to the value of the boat and gear."

In the unreported case of Negre v. The Obdam, the damages claimed by the libelant were (1) for loss by collision, (2) her salt and supplies, (3) the estimated catch for the season, (4) the fish and oil on board, and (5) the personal effects of the master and crew. The Obdam was held liable, and an order of reference to ascertain the damages was made. The commissioner disallowed the amount claimed for damages for loss of profits on the voyage. The libelant excepted "to the failure of the commissioner to allow the expected profits of the voyage," but the court overruled the exceptions, and confirmed the commissioner's report. (Dist. Ct., E. D. of N. Y.)

In Brown v. Hicks (C. C.) 24 Fed. 811, it appeared that the libelant entered into an agreement with the agent of the bark "to proceed from the port of New Bedford to Mahe, Seychelles Islands, by steam-er, and on his arrival there to take charge, as master, of the bark An-drew Hicks, and perform a whaling voyage in said bark, not ex-ceeding three years in duration, and return with said bark to the port of New Bedford," and the agent agreed to pay him "one-fifteenth lay or share of the net proceeds of the cargo obtained by said bark during the term of his service as master thereof." The voyage not proving successful, the agent recalled the bark before the expiration of three years. It was held that the libelant was entitled to recover damages, and that the measure of damages was the sum which his lay would probably have amounted to, calculated upon the basis of the average catch of vessels on the ground from the time the libelant received directions to proceed home to the expiration of the three years, deducting the time it would take for the return voyage to New Bedford. Parsons v. Terry, 1 Low. 60, Fed. Cas. No. 10,782, was cited in support of such holding. There it was held that, where the master and owner of a whaling vessel had contracted for a cruise of four seasons at a certain lay, and was wrongfully deprived of his command at the end of three seasons, he could recover against his co-owners for damages for his removal the probable value of his lay for the season on which he was about to enter when displaced.

The result of the inquiry is that the attention of the court is called to no case where a vessel was lost by collision and there was an allowance of damages for the use of the vessel after her destruction, except for pending freight or for charter hire, which is in the nature of freight. Where the vessel was not regarded as a total loss, and compensation made therefor, demurrage according to the usual rule is allowed, and in the case of fishing vessels such demurrage or

damages for detention have been ascertained by considering her probable net earnings in the enterprise to which she was devoted. So, where there has been a contract to employ a person upon a fishing expedition, from which he was entitled to recover for his services a certain share of the profits of the catch, his injury has been measured by the probable profits of such catch. In the present case, however, the libelants demand to recover not only for the total loss of the vessel and all property lost or injured at the time, but also for her use or earnings during the immediate voyage in which she was engaged and the voyages which she might further make during the season thereafter. Such a rule would keep the vessel afloat after her destruction, and credit her with fish in the sea apprehended only in expectation. It is sustained by no known rule of law, or by no recognized authority. The libelants seek to strengthen their position by the fact that the outfit, bearing in value so considerable a ratio to the vessel, was saved, and that it was rendered useless for the balance of the season. But such a principle is not applied in ordinary cases of collision. The fact that some of the necessary implements for operating the vessel were saved would not authorize the court to give damages for the total loss of the vessel and also demurrage for a loss of use. Interest from the time of the injury takes the place of the value of the use of the vessel and whatever was damaged in connection therewith. Therefore the report of the commissioner is modified to the extent of disallowing whatever was found for loss of probable catch, and substituting therefor the value of the 33 barrels of fish, at the price per barrel as found by the commissioner, with interest on the amount of damages from the time of the collision.